**FILED**

FEB 0 9 2012

CLERK

## UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH DAKOTA
## SOUTHERN DIVISION

| | |
|---|---|
| LODGENET INTERACTIVE CORPORATION and LODGENET HEALTHCARE, INC., | Case No.: 12 - 4022 |
| Plaintiffs, | **COMPLAINT** |
| v. | **(JURY TRIAL DEMANDED)** |
| MDM COMMERCIAL ENTERPRISES, INC. | |
| Defendant. | |

For their Complaint against Defendant MDM Commercial Enterprises, Inc. ("MDM"), Plaintiffs LodgeNet Interactive Corporation and LodgeNet Healthcare, Inc. (collectively and individually "LodgeNet") state and allege as follows:

### INTRODUCTION

1.     This is an action for breach of contract, breach of fiduciary duty, misappropriation of trade secrets, unfair competition and conversion arising out of MDM's impermissible use of confidential, proprietary and trade secret information it received while it was a sales agent of LodgeNet to now directly and unfairly compete with LodgeNet in violation of MDM's contractual and fiduciary duties.

2.     The unique interactive patient television products and services offered by LodgeNet to hospitals and healthcare facilities are the result of years of experience in the interactive television market and years of development and investment. As a result of its

experience and efforts, LodgeNet is now a leading provider of interactive patient television systems to the healthcare industry.

3.     MDM is a seller of commercial grade televisions and other appliances to the hospitality, education and healthcare industries. On or about April 6, 2006, LodgeNet entered into a sales agent agreement with MDM, which appointed MDM as the sales agent for LodgeNet's interactive patient television products and services. From 2006 until 2011, LodgeNet provided MDM with confidential, proprietary, and trade secret information and documents regarding all aspects of LodgeNet's healthcare business to enable MDM to effectively market and sell LodgeNet's products and services to the healthcare industry as LodgeNet's primary sales agent. The information and documents included, among other things, confidential, proprietary and trade secret information regarding LodgeNet's products, systems, services, finances, industry research, sales and marketing strategies, and specific customer contacts and price points, which LodgeNet developed over the course of several years and with significant investment.

4.     In May 2011, the parties decided to terminate their relationship. Shortly thereafter, and before the end of the agency relationship, LodgeNet learned that MDM was marketing interactive patient television products and services of its own that were directly competitive with LodgeNet's products and services and that MDM had entered into an agreement with a Canadian company to partner with it in launching an interactive patient television product in the United States. MDM could not offer the products and services it is now marketing without improperly using the confidential, proprietary and trade secret information it obtained while it was a sales agent for LodgeNet. MDM's

2

improper use of the confidential, proprietary and trade secret information and documents it obtained while it was LodgeNet's agent constitutes a breach of MDM's contractual and fiduciary obligations, misappropriation of trade secrets, unfair competition, and conversion under applicable law, entitling LodgeNet to declaratory, injunctive and monetary relief.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy, exclusive of costs and interest, exceeds $75,000.

6. Venue is proper in this Court under 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to this claim occurred in this district and MDM is deemed to reside in this district because it is subject to personal jurisdiction in this district

## PARTIES

7. LodgeNet Interactive Corporation and LodgeNet Healthcare, Inc. are Delaware corporations with their principal places of business in Sioux Falls, South Dakota.

8. MDM is a Florida corporation with its principal place of business in Ponte Vedra Beach, Florida that conducts business in all fifty states, including South Dakota.

3

## STATEMENT OF FACTS

### A.     LodgeNet Interactive Corporation

9.     LodgeNet Interactive Corporation is a publicly traded company on the NASDAQ exchange and has approximately 1,000 employees.

10.     LodgeNet is the world's leading provider of interactive media and connectivity services to hospitality and healthcare businesses and the customers they serve.

11.     LodgeNet's interactive solutions can be found in approximately 2 million hotel rooms worldwide.

12.     LodgeNet offers much more than just interactive television to its customers. It offers, among other things, site assessments, planning and design services, installation and implementation services, interactive content, technical support, and financing.

13.     As a result of its years of experience and in the interactive television industry, LodgeNet has developed expertise and a reputation that is unmatched in the industry.

### B.     LodgeNet Healthcare, Inc.

14.     In 2004, LodgeNet began proactively exploring opportunities to expand its interactive television business into the healthcare industry after receiving several inquiries from hospitals regarding the possibility of providing an interactive patient television solution to the healthcare market.

15.     In 2005, LodgeNet formally created a healthcare division.

4

16.     In 2011, LodgeNet created LodgeNet Healthcare, Inc. as a wholly-owned subsidiary of LodgeNet Interactive Corporation.

17.     LodgeNet invested significant time and resources researching the healthcare industry and engineering a unique interactive healthcare solution.

18.     LodgeNet initially partnered with a large fortune 50 healthcare supply and information technology company in an attempt to bundle its interactive products and services with a high-end bedside swing-arm touch screen device.  This approach had significant limitations for LodgeNet and resulted in few sales of LodgeNet's interactive products and services.

19.     However, LodgeNet continued to believe there was significant interest in its interactive products and services based on reports from market experts engaged by LodgeNet and additional market research.

20.     LodgeNet determined that the best approach would be to directly offer to the healthcare market interactive products and services that could be used on the existing television infrastructure that was already in place in most hospitals rather than attempting to bundle LodgeNet's solution with other more expensive healthcare technology products.  This approach would avoid the need for a large up-front investment from the hospitals and allow LodgeNet to capitalize on its reputation and years of experience providing interactive television solutions to the hospitality industry.

21.     LodgeNet also determined that, different from the hospitality industry, entertainment would not be the primary focus of its marketing efforts for the healthcare industry.  Instead, LodgeNet's marketing efforts would focus on how its interactive

5

products and services could assist healthcare customers with, among other things, patient education, regulatory compliance, accreditation requirements, and nursing shortages.

22.     LodgeNet invested significant resources to develop expertise in healthcare regulations and healthcare reform in order to align product development and sales messaging with new economic incentives facing the healthcare industry.

23.     LodgeNet also invested resources in developing the clinical expertise necessary to understand hospital needs. This included hiring personnel with clinical expertise to provide guidance on accreditation requirements and patient education content. This clinical expertise allowed LodgeNet to identify and incorporate into its offerings the appropriate blend of best-in-class content available from multiple patient education providers with differing areas of focus and strengths.

24.     LodgeNet determined that, given its history with interactive television products and services, it would market itself as being able to provide the only turn-key interactive solution. In addition to the interactive television product, LodgeNet could provide the initial site assessment, design and planning services, installation and implementation services, patient education content, and technical support. To be able to provide this package of products and services required significant investment, but also allowed LodgeNet to significantly differentiate itself from its competitors and provide a superior interactive solution.

25.     By 2005, LodgeNet believed it had developed an interactive patient television solution that would have significant interest in the healthcare industry.

6

However, LodgeNet was not yet prepared to invest in its own national sales force and was looking for potential sales and marketing opportunities.

**C.      MDM Commercial Enterprises, Inc.**

26.      Prior to 2005, MDM was in the business of selling commercial grade televisions and other low-margin products and appliances to the hospitality and education markets.

27.      Other than selling televisions and appliances, MDM provided no additional professional services to its customers other than acting as a go-between for customers and manufacturers in connection with product warranty issues.  MDM did not assist with installation or provide on-going technical support.

28.      MDM had little or no experience with interactive products and services.

29.      In 2005, several sales personnel with experience selling televisions to healthcare customers in the northeast United States were terminated by their employer and joined MDM's sales force.

30.      At this time, MDM contacted LodgeNet and indicated that it had created a new healthcare sales team focused on selling televisions and other equipment to the healthcare industry.  MDM inquired about becoming a sales agent for LodgeNet's interactive patient television solution and suggested that it could use its new healthcare team to sell the value of LodgeNet's products and services.

8495490v1

**D.    The 2006 Sales Agreement**

31.    LodgeNet and MDM entered into a Sales Representative Agreement ("2006 Agreement") on or about April 6, 2006, which appointed MDM as the non-exclusive sales agent for LodgeNet's interactive products and services.

32.    The 2006 Agreement states:

3.1 LodgeNet appoints MDM as its non-exclusive sales representative for the purpose of selling LodgeNet systems and services to the hospital industry within the United States on the terms and conditions set forth herein.

33.    The 2006 Agreement also states:

6.1 "Confidential Information" as used in this section 6 means (1) any of MDM's or LodgeNet's proprietary information (including any information that would qualify as a trade secret under applicable law), documents, designs, plans, reports, customer lists, leads and marketing information, (2) information LodgeNet identifies from time to time as confidential, or (3) information that should be treated as confidential under the circumstances surrounding its disclosure, including sales and marketing information, account information, and the contents of this Agreement and any exhibits, attachments or related agreements. . . .

6.2 LodgeNet and MDM shall hold the Confidential Information in strict confidence and shall take all necessary steps to keep the Confidential Information confidential.    Each party may disclose Confidential Information only to its officers, employees, advisors, agents and assigns who have a need to know Confidential Information in the course of fulfilling the obligations of each Party under this Agreement. LodgeNet and MDM shall each cause their respective officers, employees, advisors, agents, assigns, and affiliates to hold all Confidential Information in strict confidence. LodgeNet and MDM may use Confidential Information only for purposes established by this Agreement and must not divulge or communicate any Confidential Information to any person or entity except as permitted by this section. This Agreement does not grant LodgeNet or MDM proprietary rights in Confidential Information belonging to the other.

8495490v1

34. The importance of maintaining the confidentiality of the information and documents LodgeNet provided to MDM was made clear from the outset of the parties' relationship.

**E. MDM Receives Confidential Information and Documents**

35. MDM's sales team had previously focused only on selling low-margin televisions and appliances with limited warranty service. To effectively sell LodgeNet's higher-margin products, MDM would need to transition from just selling the product (e.g., a television) to selling a solution (e.g., educate patients, save nursing time, etc.). This proved to be a difficult transition for MDM.

36. It became apparent to LodgeNet early on that to be able to effectively sell the LodgeNet products and services to hospitals MDM would require a significant amount of training and education regarding how interactive systems functioned and the value of LodgeNet's products and services.

37. LodgeNet shared with MDM the knowledge it obtained through a number of years of industry research regarding the size of the healthcare market, business potential, competitive landscape, target audiences, and the value that LodgeNet's products and services could provide to hospitals.

38. To assist MDM with explaining to customers why LodgeNet's products and services were the best in the industry, LodgeNet provided MDM with technical information regarding how LodgeNet interactive products worked and how they were deployed and serviced.

9

39.     LodgeNet invested a significant amount of time educating MDM on sales strategies, sales training, and value proposition positioning.

40.     LodgeNet provided MDM with information on how to identify appropriate decision-makers within a highly-variable target market and instruction on message-tailoring based on economic, clinical, technological, regulatory and infrastructure needs of individual healthcare customers.  MDM amassed, directly from LodgeNet or on LodgeNet's behest and behalf, extensive and highly specific information on relevant sales contacts within hospitals based upon such information.

41.     LodgeNet provided MDM with information regarding LodgeNet's costs, pricing, budgets, and margins.

42.     LodgeNet also invested in a lead generation process that would feed hospital leads to MDM based on interest in interactive services shown from LodgeNet phone-based sales.

43.     LodgeNet and MDM had sales meetings twice a year during which the most recent and confidential marketing, sales, technical, product and financial information was provided to MDM by LodgeNet.

44.     The most recent sales meeting was in March 2010.  The meeting focused on sharing LodgeNet's newest intelligence on market needs, optimal target purchasers within the market for interactive products and services, and the need for increased clinical and regulatory know-how in sales communications. During this meeting, MDM received instruction on the appropriate manner in which to respond to requests for proposal from hospitals, how to identify hospitals most likely to benefit from interactive products and

10

services, and competitor strengths and weaknesses. The meeting also included specific training from LodgeNet's clinical expert on using the LodgeNet system to prescribe education, hospital purposes for patient education, and how nursing staff uses or should use an interactive system to deliver high-quality patient care.

45.    LodgeNet also conducted a business strategy review in June or July of each year, which was used to measure market interest, identify new product needs, review the competitive landscape, identify strengths and weaknesses, review pricing, and identify obstacles to sales. The document that was created was used by LodgeNet to determine growth rate potential and set the annual budget. Because MDM was LodgeNet's primary sales agent, this information was provided to MDM each year.

46.    MDM also received highly confidential information and documents from LodgeNet on an almost daily basis.

47.    Initially, to assist MDM with learning LodgeNet's products and services, LodgeNet personnel attended sales meetings with MDM representatives. However, the expectation was that once MDM learned the product and the sales strategies, MDM would handle sales on its own.

48.    LodgeNet would receive multiple calls each day from MDM sales personnel, sometimes in sales meetings with hospital representatives, asking for, among other things, specific information regarding technical aspects of LodgeNet's products and services, how it was installed and implemented, and pricing information.

11

**F.     MDM Fails To Meet Sales Expectations**

49.     It became apparent as time went by that the MDM sales team was attempting to use the same sales strategies it used to sell televisions to sell LodgeNet's products and services, which was highly ineffective and contrary to LodgeNet's training and instructions.

50.     Even with significant time and resources invested by LodgeNet in training and education, MDM still did not understand the patient education aspects of the LodgeNet product and did not understand the basic value propositions that would support sales to hospitals.

51.     MDM repeatedly failed to achieve its sales and revenue goals.

52.     It appeared MDM was comfortable primarily focusing its sales efforts on low-margin televisions and appliances rather than taking the time and effort necessary to sell LodgeNet's higher-margin interactive solutions.

53.     In 2009, LodgeNet communicated to MDM that it believed the market would support significantly more sales and that LodgeNet would need to explore other sales channels if MDM could not meet sales goals.

54.     LodgeNet told MDM that if it wanted to continue as LodgeNet's primary sales agent, it would need to assign sales personnel to focus on interactive sales separate from television sales and that the personnel would need to be better trained and educated.

12

### G.   MDM's Improper Conduct

55.   In addition to failing to meet sales expectations, MDM also repeatedly engaged in conduct that was contrary to its express contractual and fiduciary obligations as a sales agent for LodgeNet.

56.   Although specifically instructed by LodgeNet not to do so, MDM repeatedly attempted to brand LodgeNet's interactive solution as its own and attempted to take credit for LodgeNet's products and services.

57.   MDM failed to adhere to LodgeNet's branding standards on its website and repeatedly identified LodgeNet products as its own.

58.   There were instances where MDM would take LodgeNet price quotes and submit them to hospitals as its own.

59.   In March 2009, LodgeNet issued a press release regarding the signing of an agreement with a prestigious teaching hospital in Texas.  LodgeNet later received a copy of an MDM press release with the exact same language, but with MDM's name substituted for LodgeNet's name.

60.   There were instances where MDM would request that hospitals direct the purchase orders on interactive sales quoted by LodgeNet to MDM rather than LodgeNet in an effort to improperly take credit for LodgeNet's solutions.

61.   There were also instances where LodgeNet would provide MDM with a quote for professional services to be provided to a hospital, but would later learn that MDM had submitted its own quote to the hospital undercutting LodgeNet's quote and

13

that MDM had performed the work itself and received payment directly from the hospital.

62.     In each of these instances, LodgeNet explained to MDM that its conduct was improper and inconsistent with MDM's role and duties as sales agent.

63.     However, it was becoming increasingly clear that MDM's primary interest was its own and that MDM was not fulfilling its contractual and fiduciary obligations to LodgeNet as a sales agent.

**G.     2010 Agreement**

64.     In 2010, the parties entered into an Amended and Restated LodgeNet Healthcare Sales Agent Agreement ("2010 Agreement") in an attempt to clarify the obligations of the parties.

65.     The 2010 Agreement provides in relevant part as follows:

2.1     Appointment. LODGENET appoints AGENT and AGENT accepts appointment as an independent non-exclusive external sales representative to market and sell LODGENET systems and services to the healthcare industry within the United States on the terms and conditions set forth herein.

. . . .

3.2     AGENT represents and warrants that it shall at all times act in a professional and ethical manner while performing under this Agreement and shall make no representations regarding LODGENET systems and services that have not been previously authorized in writing by LODGENET. . .

3.3     AGENT agrees to use its best efforts to ensure that it has a current and thorough understanding of LODGENET services and systems available for sale to health care providers. . .

3.4     During the term of this Agreement, AGENT may not sell, represent, or offer directly or indirectly products or services that are competing with

14

the same or similar interactive products and related services offered by LodgeNet Healthcare of the nature and type offered by LodgeNet at the time of execution of this Agreement, unless approved by LODGENET prior to offer to the market.

3.5    Ownership of Information. AGENT acknowledges that in the course of performance under this Agreement, it will seek, for the benefit of LODGENET, information and data about prospective purchasers of LODGENET interactive systems and services. AGENT agrees that any information that it acquires for the benefit of LODGENET, and in whatever form such information is organized and retained, is LODGENET'S confidential proprietary information in relation to the sale of interactive systems and services.

. . . .

6.6    AGENT may not sell, represent, or offer directly or indirectly similar interactive products or services that are competing with the same or similar interactive products and services offered by LODGENET Healthcare for a period of 12 months following termination of this Agreement to any LODGENET Qualified Leads. This prohibition does NOT apply to professional service work for TV installations and MATV work following termination.

. . . .

7.1    "Confidential Information" as used in this section 7 means (1) any of AGENT's or LODGENET's proprietary information (including any information that would qualify as a trade secret under applicable law), documents, designs, plans, reports, customer lists, leads, and marketing information, (2) information LODGENET identifies from time to time as confidential, or (3) information that should be treated as confidential under the circumstances surrounding its disclosure, including sales and marketing information, account information, and the contents of this Agreement and any exhibits, attachments or related agreements. . .

7.2    LODGENET and AGENT shall hold the Confidential Information in strict confidence and shall take all necessary steps to keep the Confidential Information confidential. Each Party may disclose Confidential Information only to its officers, employees, advisors, agents and assigns who have a need to know Confidential Information in the course of fulfilling the obligations of each Party under this Agreement. LODGENET and AGENT shall each cause their respective officers, employees, advisors, agents, assigns, and affiliates to hold all Confidential Information in strict

15

confidence. LODGENET and AGENT may use Confidential Information only for purposes established by this Agreement and must not divulge or communicate any Confidential Information to any person or entity except as permitted by this section. This Agreement does not grant LODGENET or AGENT any proprietary rights in Confidential Information belonging to the other.

. . . .

7.4     If LODGENET or AGENT breaches the obligations established in this section, then the breaching Party consents to the other Party seeking temporary, preliminary or final injunctions, without proof of the non-breaching Party's actual damages, because remedies at law may be inadequate. Notwithstanding the foregoing, such remedies shall not be deemed to be the exclusive remedies for a breach of this section, but shall be in addition to all other remedies available at law or equity.

7.5.     LODGENET and AGENT agree to promptly return to its owner all Confidential Information, related records and all copies of Confidential Information on the earlier of expiration or termination of this Agreement. The obligations set forth in this section concerning Confidential Information and its use survive the expiration or termination of this Agreement.

. . . .

12. Governing Law

This Agreement shall be governed and construed under the laws of the State of New York, excluding its choice of law provisions.

66.     Under the terms of the 2010 Agreement, MDM was to be LodgeNet's primary sales agent for an additional six months.  MDM's performance would be evaluated based on its performance against established sales goals.  If MDM met the established sales goals, its preferential status as primary sales agent for LodgeNet would continue for additional six month periods.

16

**H.    MDM's Poor Performance Ends The Sales Agent Relationship**

67.    MDM was unable to commit to LodgeNet's sales goals for 2010.  Even though MDM was being compensated millions of dollars in sales commissions, MDM indicated that it could not meet the goals and was not willing to hire additional staff and invest the additional resources necessary to meet the sales goals.

68.    As a result, LodgeNet indicated to MDM that it had no choice but to explore other sales channels for its interactive solutions.

69.    MDM's inability to commit to meet sales expectations ultimately led to the end of MDM's sales agent relationship.

**I.    Termination Agreement**

70.    In May 2011, LodgeNet and MDM entered into an Agreement to Amend and Terminate LodgeNet Healthcare Sales Agent Agreement ("Termination Agreement").

71.    The Termination Agreement provides that the 2010 Agreement terminates as of June 30, 2010 and that there would be a winding down period that would conclude on December 31, 2011.

72.    The Termination Agreement also provides in relevant part as follows:

4.    Duties of Agent

Upon termination of the Amended and Restated Agreement, Agent will a) abide by the provisions of the Amended and Restated Agreement that, by their terms or by their nature, survive termination; and b) honor the obligations of an agent following termination of contract.  These obligations include, but are not limited to, the following:

17

. . . .

### i. Return of Confidential Information

During the Winding-Down Period, Agent shall preserve and produce to LodgeNet any and all information that is confidential and proprietary to LodgeNet (LodgeNet's "Confidential Information"), but may retain a copy of LodgeNet's Confidential Information for its use on LodgeNet's behalf until the conclusion of the Winding-Down Period. . . .

. . . .

### iv. Fair Competition.

Pursuant to the express terms of the Agreement, Agent may not sell, represent, or offer directly or indirectly similar interactive products or services that are competing with the same or similar interactive products and services offered by LodgeNet Healthcare for a period of twelve (12) months following termination of this Agreement to any LodgeNet Qualified Leads. Agent may not use, at any time, the relationships cultivated on LodgeNet's behalf, or the Confidential Information about LodgeNet's offering in relation to the client's needs, for the purpose of selling a directly competitive product or service. This latter obligation extends to all hospitals included with the list attached as Exhibit C, as will as any other hospital contacted on LodgeNet's behalf by Agent during the Winding-Down Period. Notwithstanding the foregoing, however, parties agree that Agent's marketing and sale of its own telephone-based patient education system shall not represent a violate of its post-termination obligations under the Amended and Restated Agreement, or under the law of agency, provided that such marketing and sales efforts do not involve the use or disclosure of LodgeNet's confidential Information and are not directed at any hospital listed within Exhibit C.

## J. MDM Unfairly Attempts To Compete With LodgeNet In Violation Of Its Contractual and Fiduciary Duties.

73. Throughout the sales agent relationship between MDM and LodgeNet, MDM continually failed to put the interests of LodgeNet ahead of its own.

18

74.     It is now apparent that throughout much of the time that MDM was acting as LodgeNet's sales agent it was not only failing to act in LodgeNet's best interests, it was actually acting adverse to LodgeNet's interests by collecting information and developing plans to directly compete with LodgeNet in the healthcare market.

75.     During the negotiation of the Termination Agreement, MDM disclosed for the first time that it had been developing its own telephone-based interactive patient education solution that it was planning to market to the healthcare industry.

76.     In fact, MDM was developing an interactive product that would compete directly with LodgeNet in the healthcare market.

77.     During a telephone conference with MDM's President in early 2011, MDM indicated that, contrary to its contractual and fiduciary obligations, it intended to keep any leads it received for itself, that it would do whatever it could do to prevent LodgeNet from selling its products and services, and that it was developing a competitive interactive product that MDM intended to sell to put LodgeNet out of business.

78.     Shortly thereafter, LodgeNet learned that MDM was advertising and actively marketing its own telephone-based and fully-interactive television solution to the healthcare industry.

79.     MDM's PatientLogix interactive patient television solution is advertised on its website at http://www.mdmhealthcare.com/patient-education-systems.php.

80.     The value propositions identified by MDM for its PatientLogix solution are identical or nearly identical to the LodgeNet value propositions that LodgeNet incurred

significant expense to develop and train MDM to effectively convey to customers as LodgeNet's sales agent.

81.     MDM would not have the capability to market and sell the interactive products and services it was advertising without improperly using the confidential, proprietary and trade secret information MDM obtained while a sales agent for LodgeNet.

82.     MDM marketing materials for its new interactive products and services use the exact same language and photos as LodgeNet marketing materials previously provided to MDM by LodgeNet as part of the sales agent relationship.

83.     MDM's direct competition with LodgeNet based on the improper use of LodgeNet's confidential, proprietary and trade secret information constitutes a violation of MDM's contractual and fiduciary obligations.

84.     LodgeNet also learned, through an October 29, 2011 MDM press release, that MDM was partnering with Hopitel, Inc., a Canadian company, to market and sell an interactive patient television solution in the United States that would be directly competitive with LodgeNet's interactive solution.

85.     Hopitel's new U.S. subsidiary, Patientel Networks Corporation, also has a website "Coming Soon," indicating that it also intends to market and sell the PatientLogix interactive solution.     The website can be found at http://www.patientelnetworks.com/.

20

86.    On information and belief, MDM has improperly disclosed LodgeNet's confidential, proprietary and trade secret information to Hopitel and/or Hopitel's U.S. subsidiary.

87.    MDM is now attempting to leverage all of the confidential, proprietary, trade secret information it has received from LodgeNet since 2005 to unfairly compete with LodgeNet in violation of its contractual and fiduciary obligations.

**COUNT I**
**(DECLARATORY RELIEF)**

88.    LodgeNet incorporates by reference and realleges the allegations in paragraphs 1-87 above.

89.    An actual controversy exists between MDM and LodgeNet regarding MDM's obligations to LodgeNet under applicable law as LodgeNet's former sales agent.

90.    During the time period from 2005 to 2011, LodgeNet provided MDM with confidential, proprietary and trade secret information regarding all aspects of LodgeNet Healthcare's interactive patient television products and services.

91.    MDM is now using the confidential, proprietary and trade secret information it obtained from LodgeNet to unfairly compete with LodgeNet in violation of MDM's contractual and fiduciary obligations.

92.    On information and belief, MDM has also provided LodgeNet's confidential, proprietary and trade secret information to third parties in violation of MDM's contractual and fiduciary obligations.

21

93.  LodgeNet requests a declaration under 28 U.S.C §§ 2201-02 that MDM is prohibited from competing with LodgeNet based on confidential, proprietary and trade secret information obtained from LodgeNet during the course of MDM's agency relationship with LodgeNet.

94.  LodgeNet also requests a declaration under 28 U.S.C §§ 2201-02 that MDM is prohibited from providing LodgeNet's confidential, proprietary and trade secret information to any third party.

95.  Lastly, LodgeNet requests a declaration under 28 U.S.C §§ 2201-02 that MDM is obligated to return all confidential, proprietary and trade secret information to LodgeNet.

## COUNT II
## (BREACH OF CONTRACT)

96.  LodgeNet incorporates by reference and realleges the allegations in paragraphs 1-95 above.

97.  MDM and LodgeNet entered into the 2010 Agreement and the Termination Agreement.

98.  LodgeNet performed its obligations under the 2010 Agreement and the Termination Agreement.

99.  MDM breached the 2010 Agreement and Termination Agreement.  MDM's breaches of the agreements, include, but are not limited to, the following:

- MDM improperly and in breach of its contractual obligations used LodgeNet's confidential, proprietary and trade secret information;

22

- On information and belief, MDM improperly and in breach of its contractual obligations provided LodgeNet's confidential, proprietary and trade secret information to third parties;

- MDM improperly and in breach of its contractual obligations used LodgeNet's confidential, proprietary and trade secret information to compete against LodgeNet;

- MDM improperly and in breach of its contractual obligations sold, represented, or offered for sale products or services that are competing with the same or similar interactive products and related services offered by LodgeNet;

- On information and belief, MDM improperly and in breach of its contractual obligations used the relationships it cultivated on LodgeNet's behalf for the purpose of selling a product or service that is competitive with LodgeNet's products or services; and

- MDM has failed to return all or part of LodgeNet's confidential, proprietary and trade secret information.

100.   MDM's breaches of the 2010 Agreement and the Termination Agreement have caused LodgeNet damages in an amount in excess of $75,000.

101.   LodgeNet is also entitled to injunctive relief restraining MDM's improper conduct as a result of MDM's breach of contract.

23

## COUNT III
## (BREACH OF FIDUCIARY DUTY)

102.   LodgeNet incorporates by reference and realleges the allegations in paragraphs 1-101 above.

103.   MDM was LodgeNet's agent for purposes of selling LodgeNet's interactive patient television products and services to the healthcare industry.

104.   MDM's agency relationship with LodgeNet created a fiduciary relationship and fiduciary obligations under applicable law.

105.   LodgeNet entrusted MDM with confidential, proprietary and trade secret information and documents relating to LodgeNet's interactive patient television products and services to enable MDM to effectively act as a sales agent on LodgeNet's behalf.

106.   MDM's breaches of its fiduciary duties to LodgeNet, include, but are not limited to, the following:

- MDM repeatedly breached its duty of loyalty to LodgeNet by putting its own interests ahead of the interests of LodgeNet;

- MDM repeatedly breached its duty of care to LodgeNet by failing to adequately protect LodgeNet's confidential, proprietary and trade secret information;

- MDM improperly and in breach of its fiduciary obligations used LodgeNet's confidential, proprietary and trade secret information for its own benefit and to the detriment of LodgeNet;

24

- On information and belief, MDM improperly and in breach of its fiduciary obligations provided LodgeNet's confidential, proprietary and trade secret information to third parties;

- MDM improperly and in breach of its fiduciary obligations used LodgeNet's confidential, proprietary and trade secret information to compete against LodgeNet;

- MDM improperly and in breach of its fiduciary obligations sold, represented, or offered for sale products or services that are competing with the same or similar interactive products and related services offered by LodgeNet;

- On information and belief, MDM colluded with one or more third parties during its agency relationship with LodgeNet in an attempt to develop and offer for sale products and services that are directly competitive with LodgeNet's products and services;

- On information and belief, MDM improperly and in breach of its fiduciary obligations used the relationships it cultivated on LodgeNet's behalf for the purpose of selling a product or service that is competitive with LodgeNet's products or services; and

- MDM has failed to return all or part of LodgeNet's confidential, proprietary and trade secret information.

25

107.   Throughout its agency relationship with LodgeNet, MDM failed to put the interests of LodgeNet ahead of its own.

108.   MDM's breach of its fiduciary obligations have caused LodgeNet damages in an amount in excess of $75,000.

109.   LodgeNet has no obligation to pay commissions owed to MDM for the time period that MDM was acting in breach of its fiduciary duties to LodgeNet.

110.   LodgeNet is entitled to recover as damages approximately $350,000 in commissions paid to MDM during the time period MDM was acting in breach of its fiduciary duties to LodgeNet.

111.   MDM's conduct constitutes gross, wanton and outrageous conduct under applicable law entitling LodgeNet to punitive damages.

112.   LodgeNet is also entitled to injunctive relief restraining MDM's improper conduct as a result of MDM's breach of its fiduciary duties.

## COUNT IV
## (MISAPPROPRIATION OF TRADE SECRETS)

113.   LodgeNet incorporates by reference and realleges the allegations in paragraphs 1-112 above.

114.   While MDM was a sales agent for LodgeNet, it received highly confidential, proprietary and trade secret information from LodgeNet regarding LodgeNet's products, systems, services, finances, industry research, sales and marketing strategies, and specific customer information contacts and price points, which LodgeNet developed over the course of several years and with significant investment.

26

115.   The information LodgeNet provided to MDM constitutes protected trade secrets under applicable law.

116.   The confidential, proprietary and trade secret information LodgeNet provided to MDM was not known outside of LodgeNet, was closely guarded by LodgeNet and could not be found in the public domain, was the result of significant investment over the course of several years, and could not be easily acquired or duplicated by others.

117.   The confidential, proprietary and trade secret information LodgeNet provided to MDM is being used by MDM for improper purposes.

118.   On information and belief, MDM has impermissibly provided LodgeNet's confidential, proprietary and trade secret information to third parties.

119.   MDM is using LodgeNet's confidential, proprietary and trade secret information to unfairly compete against LodgeNet in violation of MDM's contractual and fiduciary obligations.

120.   MDM has misappropriated LodgeNet's trade secrets in violation of applicable law and LodgeNet has been damaged as a result in an amount in excess of $75,000..

121.   MDM's conduct in intentionally misappropriating LodgeNet's trade secrets constitutes gross, wanton and outrageous conduct under applicable law entitling LodgeNet to punitive damages.

122.   LodgeNet is also entitled to injunctive relief restraining MDM's improper conduct as a result of MDM's misappropriation of LodgeNet's trade secrets.

27

## COUNT V
## (UNFAIR COMPETITION)

123.   LodgeNet incorporates by reference and realleges the allegations in paragraphs 1-122 above.

124.   While MDM was a sales agent for LodgeNet, it received highly confidential, proprietary and trade secret information from LodgeNet regarding LodgeNet's products, systems, services, finances, industry research, sales and marketing strategies, and specific customer information contacts and price points, which LodgeNet developed over the course of several years and with significant investment.

125.   LodgeNet entrusted MDM with LodgeNet's confidential, proprietary and trade secret information to allow MDM to act as an effective and successful sales agent on LodgeNet's behalf.

126.   MDM knew that the confidential, proprietary and trade secret information it obtained from LodgeNet was the result of significant investment of time and resources by LodgeNet over the course of several years.

127.   Knowing that it had no right to use LodgeNet's confidential, proprietary and trade secret information, MDM misappropriated the information for its own use and used the information to unfairly compete with LodgeNet.

128.   On information and belief, MDM also impermissibly provided LodgeNet's confidential, proprietary and trade secret information to third parties.

129.   When confronted by LodgeNet, MDM denied any communications or partnership with any competitor or potential competitor even though it was actively

28

colluding with another company to develop a competing interactive patient television solution.

130.   MDM has also communicated to LodgeNet an intent to interfere with LodgeNet's customer relationships and sabotage LodgeNet's healthcare business.

131.   As a result of MDM's unfair competition, LodgeNet has been damaged in an amount in excess of $75,000..

132.   MDM's unfair competition with LodgeNet constitutes gross, wanton and outrageous conduct under applicable law entitling LodgeNet to punitive damages.

133.   LodgeNet is also entitled to injunctive relief restraining MDM's improper conduct as a result of MDM's unfair competition.

**COUNT VI**
**(CONVERSION)**

134.   LodgeNet incorporates by reference and realleges the allegations in paragraphs 1-133 above.

135.   While MDM was a sales agent for LodgeNet, it received highly confidential, proprietary and trade secret information from LodgeNet regarding LodgeNet's products, systems, services, finances, industry research, sales and marketing strategies, and specific customer information contacts and price points, which LodgeNet developed over the course of several years and with significant investment.

136.   Section 3.5 of the 2010 Agreement states that "any information that [MDM] acquires for the benefit of LODGENET, and in whatever form such information

8495490v1

is organized and retained, is LODGENET's confidential proprietary information in relation to the sale of interactive systems and services."

137.   Section 7.2 of the 2010 Agreement states that the "Agreement does not grant LODGENET or AGENT any proprietary rights in Confidential Information belonging to the other."

138.   MDM has intentionally and without authority assumed and exercised control over LodgeNet's confidential, proprietary and trade secret information.

139.   MDM has interfered with LodgeNet's property rights in its confidential, proprietary and trade secret information by converting LodgeNet's property for its own use and, on information and belief, impermissibly providing LodgeNet's property to third parties.

140.   MDM's actions are in derogation of LodgeNet's property rights.

141.   MDM has converted LodgeNet's property in violation of applicable law and LodgeNet is entitled to damages as a result in an amount in excess of $75,000..

142.   MDM's conduct constitutes gross, wanton and outrageous conduct under applicable law entitling LodgeNet to punitive damages.

143.   LodgeNet is also entitled to injunctive relief restraining MDM's improper conduct as a result of MDM's conversion of LodgeNet's property.

## REQUEST FOR RELIEF

**WHEREFORE**, LodgeNet prays for judgment herein in its favor as follows:

A.   LodgeNet requests a declaration under 28 U.S.C §§ 2201-02 that MDM is prohibited from competing with LodgeNet based on confidential,

proprietary and trade secret information obtained from LodgeNet during the course of MDM's agency relationship with LodgeNet;

B.    LodgeNet requests a declaration under 28 U.S.C §§ 2201-02 that MDM is prohibited from providing LodgeNet's confidential, proprietary and trade secret information to any third party;

C.    LodgeNet requests a declaration under 28 U.S.C §§ 2201-02 that MDM is obligated to return all confidential, proprietary and trade secret information to LodgeNet;

D.    LodgeNet requests an injunction prohibiting MDM from competing with LodgeNet based on confidential, proprietary and trade secret information obtained from LodgeNet during the course of MDM's agency relationship with LodgeNet;

E.    LodgeNet requests an injunction prohibiting MDM from providing LodgeNet's confidential, proprietary and trade secret information to any third party;

F.    LodgeNet requests an injunction requiring MDM to return all confidential, proprietary and trade secret information to LodgeNet;

G.    LodgeNet requests compensatory and punitive damages in an amount to be determined at trial, together with interest thereon, costs, and attorneys' fees; and

H.    LodgeNet requests such further relief as the Court deems just and equitable.

31

Dated: 2/8/12

LEONARD, STREET AND DEINARD, P.A.


Michael G. Taylor (SD # 3366)
150 South Fifth Street, Suite 2300
Minneapolis, Minnesota 55402
Telephone:  (612) 335-1500
Fax: (612) 335-1657
*michael.taylor@leonard.com*

*Attorneys for Plaintiffs*